IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-633

Filed: 2 June 2020

Buncombe County, No. 17 CVS 500

NANCY KELLER, by and through her attorney-in-fact, LESLIE ANN KELLER, Plaintiff,

v.

DEERFIELD EPISCOPAL RETIREMENT COMMUNITY, INC. and JEFFREY TODD EARWOOD, Defendants.[1]

Appeal by plaintiff from order entered 17 August 2018 by Judge Marvin P. Pope, Jr., in Buncombe County Superior Court, and from judgment entered 6 November 2018 by Judge Thomas H. Lock in Buncombe County Superior Court. Heard in the Court of Appeals 5 February 2020.

> *Law Office of David Pishko, P.A., by David Pishko, for plaintiff-appellant.*
>
> *Parker Poe Adams & Bernstein LLP, by John H. Beyer and Katherine H. Graham, for defendant-appellee Deerfield Episcopal Retirement Community, Inc.*
>
> *Dickie, McCamey & Chilcote, PC, by Joseph L. Nelson, for defendant-appellee Jeffrey Todd Earwood.*

ZACHARY, Judge.

Plaintiff Nancy Keller, by and through her attorney-in-fact, Leslie Ann Keller, appeals from (1) an order granting summary judgment and dismissing Keller's claims

---

[1] Defendant Earwood's first name is spelled inconsistently throughout the record. Accordingly, we adopt the spelling found in the order and judgment from which Plaintiff appeals.

against Defendant Deerfield Episcopal Retirement Community, Inc.; and (2) a judgment entered upon a jury's verdict finding in favor of Defendant Jeffrey Todd Earwood on Keller's claim of battery. After careful review, we affirm.

## Background

In April 2013, Plaintiff Nancy Keller ("Keller") joined Defendant Deerfield Episcopal Retirement Community, Inc. ("Deerfield"), as an independent living resident. In December 2014, Keller moved to Deerfield's assisted living section because "she was consistently forgetting to do things" and required supervision. Soon thereafter, on 11 March 2015, Keller moved to Deerfield's skilled nursing section, due to her advanced dementia.

Defendant Jeffrey Todd Earwood ("Earwood"), was employed as a certified nursing assistant at Deerfield. On 30 March 2015, Earwood was assisting Deerfield residents returning to their rooms after lunch when he noticed Keller walking down the hallway, "heading in the wrong direction" and "looking confused." Earwood offered to help her back to her room, which was a usual task after lunch. While Earwood was helping Keller, another Deerfield staff member asked for Earwood's help with a dressing change for a patient in the neighboring room.

Earwood led Keller into her room, closing the bottom half of the Dutch door behind them, but leaving the top half open. When Keller asked Earwood where she should sit, he reminded her that this was her room, and she could sit anywhere she

wanted.  Keller sat on her bed, and Earwood asked her if he could get her anything. Keller replied that she  did not "know if [she] c[ould] trust [him,]" so Earwood sat down beside her on the edge of the bed, getting "eye level"—as he was trained to do— and jokingly asked Keller, "[I]s this not a face you can trust?"  Keller responded, "[T]he rest is up to you."  Earwood then stood up and told Keller that he would "prove [him]self" in order to earn her trust.  He patted Keller on the shoulder, and Earwood left to help with another patient's dressing change.  Earwood was in Keller's room "for approximately one minute."

Soon thereafter, Keller's personal aide, Iris Hinze, arrived.  Keller told her aide that "someone had exposed himself to her and had put her hand on his private parts." Hinze then stepped in the hallway, and asked Earwood if "it was him who had walked [Keller] back to her room[.]"  Earwood confirmed and inquired whether "everything was okay," and then left to finish his shift.

Upon Keller's request, Hinze called Keller's daughter, Leslie Ann Keller, and Keller informed her of the alleged incident.  Leslie arrived at Deerfield soon thereafter, and she took Keller and Hinze to meet with the facility's social worker. Keller shared with the social worker that "a man had come into her room and exposed himself to her."  She also told the social worker that the man had "placed her hand on his private parts and . . . fondled himself" in front of her.

- 3 -

The acting director of nursing was immediately notified of the incident, and Earwood was questioned about the alleged sexual battery during a phone call with Deerfield's director of quality assurance and the unit coordinator. Earwood was suspended, pending Deerfield's internal investigation of the sexual battery allegation.

On 31 March 2015, Deerfield submitted the required 24-Hour Initial Report to the North Carolina Department of Health and Human Services, Health Care Personnel Registry. Deerfield timely submitted the requisite "5-Working Day Report" on 6 April 2015. Deerfield concluded its internal investigation that day, determining that it was "unable to substantiate allegations" due to the absence of direct witnesses, Keller's clinical diagnosis of dementia, and a physician's determination that she lacked capacity. After 31 March 2015, Keller never raised the allegation again.

On 7 April 2015, Earwood was reinstated and permitted to return to work. Upon his return, Earwood was assigned to work on a different hall where he did not have direct contact with Keller, and where he received more supervision.

By mid-June 2015, the Healthcare Personnel Registry; Buncombe County Department of Social Services, Adult Protective Services Unit ("DSS"); and the North Carolina Division of Health Service Regulation had received reports about the alleged assault. The three agencies independently concluded that the allegation was

unsubstantiated. However, Leslie did not agree with these conclusions, and thus, as attorney-in-fact for her mother, on 30 January 2017, Leslie filed a complaint asserting claims against Earwood and Deerfield. Specifically, the complaint asserted claims for assault and battery against Earwood. The complaint also asserted claims against Deerfield for ratification of Earwood's assault and battery under the theory of respondeat superior, and for negligent supervision and retention of Earwood. She also sought to recover punitive damages from Deerfield.

On 9 March 2017, Earwood filed a motion to dismiss, answer, and affirmative defenses. On 6 June 2018, Deerfield moved for summary judgment and attorney's fees. Earwood also moved for summary judgment on 23 July 2018.

Defendants' motions for summary judgment came on for hearing before the Honorable Marvin P. Pope, Jr., in Buncombe County Superior Court on 13 August 2018. On 17 August 2018, Judge Pope entered orders denying Earwood's motion for summary judgment, granting Deerfield's motion for summary judgment, dismissing Keller's claims against Deerfield with prejudice, and denying Deerfield's motion for attorney's fees.

On 24 September 2018, Keller's claims against Earwood came on for trial by jury in Buncombe County Superior Court, the Honorable Thomas H. Lock presiding. On 28 September 2018, Judge Lock granted Earwood's motion for directed verdict on the claim of assault. On 1 October 2018, the jury unanimously found that Earwood

did not commit a battery upon Keller, and on 6 November 2018, Judge Lock entered judgment in accordance with the jury's verdict.

Keller filed timely notice of appeal to this Court from the order granting summary judgment in favor of Deerfield, and the trial court's final judgment reflecting the jury's verdict in favor of Earwood.

## Discussion

Keller sets forth four arguments on appeal: (i) the trial court erred in granting summary judgment in favor of Deerfield on the claim that Deerfield ratified Earwood's sexual battery; (ii) the trial court erred in granting summary judgment in favor of Deerfield on the claim for negligent retention and supervision of Earwood; (iii) the trial court erred by overruling her objection to the admission of opinion testimony by James Parsons, M.D.; and (iv) the trial court erred by excluding evidence of an alleged prior assault by Earwood against a Deerfield resident.

## I. Summary Judgment

Keller first challenges the trial court's grant of summary judgment in favor of Deerfield as to her claims for (i) ratification of Earwood's sexual battery; and (ii) negligent retention and supervision of Earwood.

*A. Standard of Review*

Summary judgment is proper only if: "(1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that

there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law." *Honeycutt v. Honeycutt*, 208 N.C. App. 70, 77, 701 S.E.2d 689, 694 (2010) (citation omitted).

In ruling on a motion for summary judgment, the trial court must view the evidence "in the light most favorable to the non-moving party." *RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 251 N.C. App. 562, 566, 795 S.E.2d 641, 644 (citation omitted), *disc. review denied*, 370 N.C. 213, 804 S.E.2d 546 (2017). Furthermore, it is well established that

> [t]he party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact. This burden may be met by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of h[er] claim or cannot surmount an affirmative defense which would bar the claim.

*Badin Shores Resort Owners Ass'n v. Handy Sanitary Dist.*, 257 N.C. App. 542, 549, 811 S.E.2d 198, 204 (2018) (citation omitted).

"Once the party seeking summary judgment makes the required showing, the burden shifts to the non-moving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that [s]he can at least establish a *prima facie* case at trial." *Id.* at 550, 811 S.E.2d at 204 (citation omitted). "[T]he non-moving party must forecast sufficient evidence to show the existence of a

genuine issue of material fact in order to preclude an award of summary judgment." *Id.* (citation omitted).

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and internal quotation marks omitted). Indeed, "if a grant of summary judgment can be sustained on any grounds, it should be affirmed on appeal." *RME Mgmt., LLC*, 251 N.C. App. at 567, 795 S.E.2d at 645 (citation and internal quotation marks omitted).

*B. Analysis*

1. Ratification

Keller first argues that the trial court "erroneously concluded that no reasonable jury could find that [her] forecast of evidence was sufficient to establish that Deerfield ratified Earwood's conduct toward her, making Deerfield liable for the emotional distress she suffered as a result[.]" Specifically, Keller contends that Deerfield ratified Earwood's sexual battery "by conducting an inadequate, skewed investigation and preventing other more objective agencies from investigating the alleged crime." We disagree.

To establish that an employer ratified the wrongful act of an employee, the plaintiff must show either (1) that "the employer had knowledge of all material facts

and circumstances relative to the wrongful act, and that the employer, by words or conduct, show[ed] an intention to ratify the act[,]" *Brown v. Burlington Industr., Inc.*, 93 N.C. App. 431, 437, 378 S.E.2d 232, 236 (1989) (citation omitted), *disc. review improvidently allowed*, 326 N.C. 356, 388 S.E.2d 769 (1990), or (2) "had knowledge of facts which would lead a person of ordinary prudence to investigate further[,]" *Guthrie v. Conroy*, 152 N.C. App. 15, 27, 567 S.E.2d 403, 412 (2002) (citation and internal quotation marks omitted). Ratification may be evidenced by "any course of conduct on the part of the principal which reasonably tends to show an intention on his part to ratify the agent's unauthorized acts." *Brown*, 93 N.C. App at 437, 378 S.E.2d at 236 (citation omitted). Such course of conduct may involve a failure to act. *See id.*

Here, Keller contends that a reasonable jury could find that her forecast of evidence was sufficient to establish that Deerfield ratified Earwood's alleged sexual battery, thus rendering Deerfield liable for Keller's resulting emotional distress. Keller contends that the following demonstrates Deerfield's intention to ratify Earwood's conduct:

> a) Deerfield did not notify any law enforcement agency of [Keller's] allegation against Earwood. The sexual assault certainly would constitute a crime, but Deerfield officials chose to conduct an investigation in house, rather than call in objective investigators with special skills in interviewing criminal suspects and victims.

b) Despite their knowledge of [Keller's] memory issues, Deerfield's officers did not seek the assistance of anyone trained in interviewing persons with dementia and chose not to videotape [Keller's] account of what occurred so that a person with training could assess her credibility.

c) Deerfield employees did not interview Earwood in person and thus had no opportunity to assess his credibility. Parris, Deerfield's Director of Quality Assurance, was placed in charge of the investigation. He elected to interview Earwood over the telephone and then asked Earwood to submit a written statement. Further, no one confronted Earwood about the significant inconsistency in his two accounts of what occurred in [Keller's] room – whether he sat beside her on the bed or in front of her in a chair, or about the discrepancy between his description of his conduct after the alleged assault and the description provided by Nurse Ouellette.

d) Deerfield omitted the significant fact in its reports to the Health Care Personnel Registry that [Keller] alleged that Earwood not only exposed his "private parts" but forced her to fondle his penis. Deerfield also stated in its first report, before any type of investigation, that there was no reasonable suspicion of a crime. Within less than 24 hours, Deerfield officials decided to totally discount [Keller's] account.

e) Deerfield submitted inaccurate and misleading reports to the Health Care Personnel Registry – describing a less severe "exposure" incident – arguably to encourage the state agency to forego any investigation.

f) No Deerfield employee interviewed or assessed [Keller] after 31 March 2015 – one day after the alleged assault. Yet, Deerfield reported to the State that [Keller] did not have mental anguish lasting five days or more and also maintained that [Keller] "totally forgot" the assault after one day.

g) Deerfield officials rejected the recommendation of its Director of Nursing and Director of Quality Assurance that Earwood's employment be terminated. These recommendations were based in part on the fact that Earwood had "a couple of other disciplinary issues" and the fact that [Keller] had never made any sort of similar allegation during her time at Deerfield. . . .

h) Deerfield's President and CEO expressed a concern that, if [Keller's] allegation was believed, a similar complaint could be lodged against him.

i) After [Keller's] report of abuse, Deerfield did not monitor Earwood's interaction with other residents. Rather, Deerfield's nursing staff was instructed to institute behavioral monitoring of [Keller], specifically documenting her interaction with male residents. Nothing uncovered in Deerfield's sham investigation suggested that [Keller] initiated or encouraged Earwood's sexual advance. The decision to monitor her could be reasonably interpreted as a form of punishment for her report against Earwood.

Keller's allegations lack merit. The acting director of nursing "was immediately notified of the incident[,]" and Earwood was questioned about the alleged sexual battery the same day that the allegation was made. Additionally, Earwood was suspended at once pending Deerfield's internal investigation of the sexual battery allegation, and he was permitted to return to work only after Deerfield determined that Keller's allegation could not be substantiated. Upon his return, Earwood was assigned to work on a different hall where he did not have direct contact with Keller, and where he received a higher level of supervision.

Furthermore, Deerfield fully cooperated with all third-party investigations. Under N.C. Gen. Stat. § 131E-256(a), the North Carolina Department of Health and Human Services must

> establish and maintain a health care personnel registry containing the names of all health care personnel working in health care facilities in North Carolina who have:
>
> (1) Been subject to findings by the Department [of Health and Human Services] of:
>
> > a. Neglect or abuse of a resident in a health care facility or a person to whom home care services as defined by [N.C. Gen. Stat. §] 131E-136 or hospice services as defined by [N.C. Gen. Stat. §] 131E-201 are being provided.
> >
> > . . . .
> >
> > (2) Been accused of any of the acts listed in subdivision (1) of this subsection, but only after the Department [of Health and Human Services] has screened the allegation and determined that an investigation is required.
>
> The Health Care Personnel Registry shall also contain findings by the Department [of Health and Human Services] of neglect of a resident in a nursing facility or abuse of a resident in a nursing facility or misappropriation of the property of a resident in a nursing facility by a nurse aide that are contained in the nurse aide registry under [N.C. Gen. Stat. §] 131E-255.

N.C. Gen. Stat. § 131E-256(a) (2019); *see also id.* § 131E-1(1).

To facilitate this process, health care facilities must submit certain reports when residents allege abuse against health care personnel at the facilities, which the

Department then screens to determine whether an investigation is required. On 31 March 2015, Deerfield submitted to the Health Care Personnel Registry the required 24-Hour Initial Report, followed by the requisite 5-Working Day Report on 6 April 2015. *See id.* § 131E-256(g) ("The results of all investigations must be reported to the Department [of Health and Human Services] within five working days of the initial notification to the Department."); *see also id.* § 131E-1(1).

On 8 April 2015, the Health Care Personnel Registry wrote to Deerfield, noting that it had "carefully review[ed] the reported allegation," and "determined that an investigation w[ould] not be conducted in this case." Then, between 15 and 18 June 2015, personnel from the North Carolina Division of Health Services Regulation conducted an on-site investigation at Deerfield, and determined that "[b]ased on observations, record review, staff, resident, and family interviews this allegation could not be substantiated at the time of the investigation." Thereafter, during June and July 2015, DSS Adult Protective Services agents conducted an on-site investigation. Noting that there was "no evidence" that Keller was abused, DSS determined that the allegation was unsubstantiated, and concluded that Keller did not need protective services.

Moreover, contrary to Keller's assertions on appeal, Keller did not forecast "evidence demonstrating specific facts" in support of her allegations that she suffered emotional distress as a result of the alleged battery, or that Deerfield forced her to

relocate to another facility. *Badin Shores Resort Owners Ass'n*, 257 N.C. App. at 550, 811 S.E.2d at 204. In fact, at her 14 July 2017 deposition, Leslie testified that, since March 2015, no mental health professional had diagnosed Keller with "any mental or emotional condition related to" the alleged events; Keller had not been "prescribed any kind of antidepressant or antianxiety medication for anything" related to the alleged events; no healthcare professional had diagnosed Keller as suffering from any kind of mental anguish; and Keller had not been seen by any "therapist, counselor, [or] mental health professional, for . . . anything relating to" the alleged event.

"As discussed above, [Keller], as the non-movant, must come forward with facts to counter a proper motion for summary judgment. The official record contains no factual evidence showing" that Deerfield ratified Earwood's conduct. *Graham v. Hardee's Food Sys.*, 121 N.C. App. 382, 387, 465 S.E.2d 558, 561 (1996).

Accordingly, the trial court properly granted summary judgment in favor of Deerfield as to Keller's claim of ratification.

2. Negligent Supervision and Retention

"North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998) (citation omitted). "This basis for imposing liability upon the [employer] for an assault by his employee is . . . the negligence of the [employer], himself, in the selection or

supervision of his employee." *Wegner v. Delly-Land Delicatessen, Inc.*, 270 N.C. 62, 65, 153 S.E.2d 804, 807 (1967).

"A presumption exists that an employer has used due care in hiring his employees." *Stanley v. Brooks*, 112 N.C. App. 609, 612, 436 S.E.2d 272, 274 (1993) (citation omitted), *disc. review denied*, 335 N.C. 772, 442 S.E.2d 521 (1994). To overcome this presumption, "[t]he burden rests with the plaintiff to show that [s]he has been injured as a result of the employer's negligent hiring if the employer had actual or constructive knowledge of the employee's incompetency." *Id.* (citation omitted).

To succeed on a claim for negligent supervision or retention, the plaintiff must prove:

> (1) the specific negligent act on which the action is founded[;] (2) *incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; . . .* (3) *either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision*[;] and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (first emphasis added) (citations and internal quotation marks omitted).

Accordingly,

> employers of certain establishments can be held liable to an invitee therein assaulted by an employee of the place of

- 15 -

> business whom the employer knew, or in the exercise of reasonable care in the selection and supervision of his employees should have known, to be likely, by reason of past conduct, bad temper or otherwise, to commit an assault, even though the particular assault was not committed within the scope of the employment.

*Stanley*, 112 N.C. App. at 611, 436 S.E.2d at 273 (citation and internal quotation marks omitted).

On appeal, Keller argues that she presented evidence from which a reasonable jury could have concluded that Deerfield should have known that Earwood was dangerous to residents and unfit for his job. In particular, Keller submits that she forecast sufficient evidence to establish that Deerfield was aware that Earwood posed a threat to its residents, yet continued to allow Earwood to interact with vulnerable individuals.

Keller, "as the non-movant, must come forward with facts to counter a proper motion for summary judgment. The official record contains no factual evidence showing" that Deerfield had knowledge of Earwood's alleged proclivity for sexual misconduct. *Graham*, 121 N.C. App. at 387, 465 S.E.2d at 561. In fact, the record is replete with evidence demonstrating that Deerfield did *not* have such notice.

Prior to hiring Earwood, Deerfield "completed a background check, and fingerprints had gone to the SBI and FBI. All checks had come back with no violations of any kind. The Health Registry check had come back with no violations." Additionally, Earwood was suspended pending Deerfield's investigation and was

permitted to return to work only after Deerfield determined that Keller's allegation could not be substantiated. Thus, it cannot be said that prior to the alleged act, Deerfield knew or had reason to know of Earwood's alleged potential for battery. *See id.* at 385, 465 S.E.2d at 560.

Finally, we note that following a jury trial, Earwood was unanimously found not to have sexually battered Keller, and Judge Lock entered a judgment reflecting the verdict on 6 November 2018. "[W]here the agent has no liability, there is nothing from which to derive the principal's liability[.]" *Cameron Hospitality, Inc. v. Cline Design Assocs.*, 223 N.C. App. 223, 226, 735 S.E.2d 348, 351 (2012) (citation omitted), *disc. review denied*, 366 N.C. 564, 738 S.E.2d 370 (2013). Keller's claims against Deerfield are dependent upon the alleged tortious conduct of Earwood. "The only tortious conduct by an employee of [Deerfield's] that [Keller] has alleged is the acts of [Earwood,] which were the basis of her claims against him." *Graham*, 121 N.C. App. at 385, 465 S.E.2d at 560. "[I]t has been judicially determined that" Earwood "is not liable for any tortious conduct[,]" and Keller "has not shown that an employee of [Deerfield] committed a tortious act"; thus, "this cause of action fails." *Id.*

Accordingly, the trial court did not err by granting summary judgment in favor of Deerfield on Keller's claim for negligent supervision and retention.

## II. Dr. Parsons's Testimony

Keller next argues that the trial court committed reversible error by overruling her objections to opinion testimony by Dr. James Parsons. Specifically, Keller argues that Dr. Parsons's testimony "was entirely speculative and highly prejudicial" because his testimony that Keller's "medication may have caused her to 'hallucinate'" was an improper opinion, in that it was formed "without ever even meeting [Keller] in person." We disagree.

*A. Standard of Review*

As a general matter, "evidentiary errors are considered harmless unless a different result would have been reached at trial." *Union Cty. Bd. of Educ. v. Union Cty. Bd. of Comm'rs*, 240 N.C. App. 274, 283, 771 S.E.2d 590, 596 (2015) (citation omitted). "[O]n appeal . . . the burden is on the appellant to not only show error, but also to show that [s]he was prejudiced and a different result would have likely ensued had the error not occurred." *Outlaw v. Johnson*, 190 N.C. App. 233, 247, 660 S.E.2d 550, 561 (2008) (citation and internal quotation marks omitted).

"We . . . review a trial court's ruling on the admission or exclusion of expert testimony for abuse of discretion." *N.C. Dep't of Transp. v. Mission Battleground Park, DST*, 370 N.C. 477, 480, 810 S.E.2d 217, 220 (2018) (citation omitted). "A trial court abuses its discretion if its decision is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Pope v. Bridge*

*Broom, Inc.*, 240 N.C. App. 365, 369, 770 S.E.2d 702, 707 (citations and internal quotation marks omitted), *disc. review denied*, 368 N.C. 284, 775 S.E.2d 861 (2015).

## B. Analysis

Expert-witness testimony is governed by Rule 702 of the North Carolina Rules of Evidence. *See* N.C. Gen. Stat. § 8C-1, Rule 702. Subsection (a) of Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> > (1) The testimony is based upon sufficient facts or data.
> > (2) The testimony is the product of reliable principles and methods.
> > (3) The witness has applied the principles and methods reliably to the facts of the case.

*Id.* § 8C-1, Rule 702(a).

Expert "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* § 8C-1, Rule 704. Moreover,

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon

the subject, the facts or data need not be admissible in evidence.

*Id.* § 8C-1, Rule 703.

The "facts or data upon which an expert bases an opinion may be derived from three possible sources[,]" including "the personal observation of the witness[,]" "presentation at trial by a hypothetical question or by having the expert attend the trial and hear the testimony establishing the facts[,]" and "presentation of data to the expert outside of court." *Id.* cmt. Indeed, "an expert may testify as to the facts upon which his opinion is based, even though the facts would not be admissible as substantive evidence." *Id.* cmt.

On appeal, Keller argues that Earwood's expert witness, Dr. Parsons, "based his testimony entirely on the medical records of [Keller's] primary care physician and the depositions taken in this case[,]" rendering it "entirely speculative and highly prejudicial." This argument ignores the plain language of Rule 703, as well as our robust body of case law construing it.

Rule 703 explicitly permits an expert witness to base his opinion on records and deposition testimony. *See* N.C. Gen. Stat. § 8C-1, Rule 703 (providing that the "facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to him* at or before the hearing" (emphasis added)). Moreover, "[i]t is well settled that an expert witness need not testify from firsthand personal knowledge, so long as the basis for the expert's opinion

is available in the record or on demand." *Martishius v. Carolco Studios, Inc.*, 142 N.C. App. 216, 222, 542 S.E.2d 303, 307 (2001) (citation omitted), *aff'd*, 355 N.C. 465, 562 S.E.2d 887 (2002).

Here, there is no question that Keller had full access to the materials from which Dr. Parsons formed his opinion, all of which are available in the record.

Moreover, Keller incorrectly states that Dr. Parsons "never expressed his opinions to a reasonable degree of medical certainty or probability." During voir dire, Dr. Parsons testified that he based his opinion on Keller's medical records and Leslie's perceptions of Keller:

> [DR. PARSONS:] I think there's enough documentation in [Keller's physician's] records that this lady – well, not only in his records per his perception, but also the daughter's perception that [Keller's] dementia was getting worse, that there was certainly evidence of her having some delusions, if not hallucinations, and that more . . . likely than not this was a manifestation of her dementia and unlikely that it would be an actual event.
>
> [DEFENSE COUNSEL:] *And that's an opinion you hold to a reasonable degree of medical certainty?*
>
> [DR. PARSONS:] I think the medical records justify that, *yes*.

(Emphases added).

Dr. Parsons then explained that he formed his opinion from facts gleaned upon review of Keller's medical records. Dr. Parsons stated, in relevant part:

[DR. PARSONS:] I think one of the earliest things that impressed me was this note from [Keller's physician] in January of 2012 in which it says that [another physician] [in] December of 2011 prescribed Aricept. And it says [Keller] only took Aricept for about six days, but then she stopped it due to side effect concerns. It has been some possible delusional paranoid behavior as she accused her daughter-in-law of stealing some jewelry that cannot be located.

So I mean, that impressed me that there was a medication that induced a sudden worsening which comes into play prior to this incident [o]n March 30th because she was started on sort of a similar medication, Namenda, just a few weeks before that. But through this record it talks about, you know, the signs and symptoms of worsening dementia.

. . . .

[DEFENSE COUNSEL:] . . . [Y]ou mentioned a moment ago that [Keller] had been put on some medications a few weeks before the allegations in this case.

[DR. PARSONS:] Yes.

. . . .

Q. And the last time she was placed on a medication like Namenda, the Aricept, [Keller] exhibited some delusional paranoid behaviors?

A. Yes.

After the trial court noted that "Rule 704 . . . allows an expert to testify in the form of an opinion, even though the opinion may embrace the ultimate issue to be

- 22 -

decided by the trier of fact[,]" Keller's counsel explained the basis of Keller's objection

to Dr. Parsons's testimony:

> Really, the basis was the way the question was worded,
> that he asked do you have opinions about her allegation?
> And then he added and whether or not – or its relationship
> to her dementia. I'm objecting to the – I don't think he can
> testify I don't believe her. You know, I think he did testify
> as he's described here, that I'm a medical doctor, I've seen
> this, I've read her records, this is my medical opinion. I
> don't believe he can testify about whether or not he believes
> her. He can testify he thinks this is probably a delusion.

In denying Keller's motion to strike Dr. Parsons's testimony, the trial court stated

that "during the voir dire . . . held outside the jury's presence, *he did express his*

*opinions to a reasonable degree of medical certainty*." (Emphasis added).

In addition, a second expert witness, Dr. Andrew Farah, later testified "[t]o a

reasonable degree of medical certainty" that he "couldn't disagree" with Dr. Parsons's

opinion that Keller's "medication changes could be related to an increase in delusions"

and that he thought that Dr. Parsons was "spot on" regarding the likelihood that

Keller's medication may have caused her to hallucinate:

> [DR. FARAH:] I couldn't argue with [Dr. Parsons's]
> premise that [Aricept and Namenda] can cause delusional
> thinking. They can. I mean, that's a known side effect. I
> think in my experience sometimes I don't know if it's the
> drug or just the disease progression or some combination
> of both that's causing the delusion.
>
> [DEFENSE COUNSEL:] All right. We saw when [Keller]
> tried the trial of Aricept back in 2012 there were some
> delusional paranoid behavior[s]. Do you recall seeing that?

A.  Correct.

Q.  Would the potential side effects of Namenda when it was tried in the spring of 2015 be similar to the side effects of Aricept?

A.  Yes.  I mean, a textbook answer, yes.  I think there's a tremendous variability from patient to patient and some may tolerate one and not the other, but in general they are similar.  You would expect it to cross over in those side effects.

Keller's counsel also elicited testimony from Dr. Farah about the possibility of medication-induced delusions.  Moreover, like Dr. Parsons, Dr. Farah formed his expert opinion based on a review of Keller's medical records and without meeting with her personally.

The trial court did not err by overruling Keller's objection to Dr. Parsons's opinion testimony.  But even if the trial court erred by permitting Dr. Parsons to base his expert opinion testimony entirely on Keller's medical records and the depositions taken in this case, such error would have been harmless, given Dr. Farah's similar testimony to which Keller did not object, and a portion of which she actually elicited. *See Union Cty. Bd. of Educ.*, 240 N.C. App. at 283, 771 S.E.2d at 596; *see also Frugard v. Pritchard*, 338 N.C. 508, 512, 450 S.E.2d 744, 746 (1994) ("A party may not complain of action which he induced." (citations omitted)).

III. Exclusion of Earwood's Alleged Prior Assault

Finally, Keller argues that the trial court erred by excluding evidence of an alleged prior assault by Earwood against another Deerfield resident. Specifically, Keller argues that the trial court's finding—that the prior incident during which Earwood allegedly choked another resident was not substantially similar to Keller's allegation of sexual assault—was not supported by the evidence. We disagree.

*A. Standard of Review*

"We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion." *State v. Schmieder*, __ N.C. App. __, __, 827 S.E.2d 322, 326 (citation omitted), *disc. review denied*, 372 N.C. 711, 830 S.E.2d 832 (2019).

Again, "evidentiary errors are considered harmless unless a different result would have been reached at trial." *Union Cty. Bd. of Educ.*, 240 N.C. App. at 283, 771 S.E.2d at 596 (citation omitted). "[T]he burden is on the appellant to not only show error, but also to show that he was prejudiced and a different result would have likely ensued had the error not occurred." *Outlaw*, 190 N.C. App. at 247, 660 S.E.2d at 561 (citation omitted).

*B. Analysis*

Rule 404(b) permits the admission of "evidence of other crimes, wrongs, or acts" for purposes *other than* to show that the defendant "acted in conformity therewith." N.C. Gen. Stat. § 8C-1, Rule 404(b). Rule 404(b)

> is a general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*Schmieder*, __ N.C. App. at __, 827 S.E.2d at 326 (citation and internal quotation marks omitted). "Such evidence may be admitted under this rule as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." *Id.* (citation and internal quotation marks omitted).

At trial, Keller sought to introduce evidence of an alleged prior assault by Earwood against another Deerfield resident. Keller's counsel explained the basis for introducing evidence of the alleged prior assault, noting that a jury could find that the alleged prior assault was "an incident similar enough to what happened here *to give some indication as to* [Earwood's] *propensity* to engage in that kind of conduct[,]" and could determine that Earwood is a "dangerous person." (Emphasis added).

Even assuming, *arguendo*, that the alleged acts were substantially similar, Keller's sole purpose in proffering evidence of an alleged prior assault was to establish Earwood's "propensity to engage in that kind of conduct." Rule 404(b) explicitly requires the exclusion of evidence of other crimes, wrongs, or acts under these circumstances. Keller sought to admit evidence of Earwood's alleged prior assault only to "prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it." N.C. Gen. Stat. § 8C-1, Rule 404 cmt.

Thus, the trial court did not abuse its discretion in excluding evidence of an alleged prior assault by Earwood.

## Conclusion

For the reasons stated herein, we hold that the trial court did not err by (i) granting summary judgment in favor of Deerfield; (ii) admitting Dr. Parsons's expert opinion testimony; or (iii) excluding evidence of a prior alleged assault offered solely for the improper purpose of demonstrating Earwood's propensity to commit similar acts against Keller. Accordingly, we affirm.

AFFIRMED.

Judges MURPHY and ARROWOOD concur.